Case 4:19-cr-00098-A Document 1 Filed 01/07/19 Page 1 of 17 PageID 1

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN - 7 2019

CLERK U.S. DISTRICT COURT
By: _____
 Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL DASEAN ROBINSON (01)

No. 4:19-MJ- 016

## CRIMINAL COMPLAINT

**Conspiracy to Possess a Controlled Substance with Intent to Distribute**

Beginning in or before November 2017, and continuing until in and around January 2019, in the Fort Worth Division of the Northern District of Texas, and elsewhere, the defendant, **Michael Dasean Robinson** along with others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to engage in conduct in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), namely to possess with intent to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance.
In violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)).

**Distribution of a Scheduled I Controlled Substance and Aiding and Abetting**

On or about November 30, 2017, in the Fort Worth Division of the Northern District of Texas, and elsewhere, the defendant, **Michael Dasean Robinson,** aided and abetted by others known and unknown, did knowingly and intentionally distribute a mixture or substance containing a detectable amount of heroin, a Scheduled I controlled substance, and the use of said substance resulted in the death or seriously bodily injury of B.F.

In violation of 21 U.S.C. § 841 (a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

I, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

1. On December 1, 2017 the Southlake Police Department and Southlake EMS responded to deceased person call at XXX Vermillon Court in Southlake, Texas. The deceased person was identified as B.F.

Criminal Complaint – Page 1

Based on evidence collected at the residence investigators believed that it was possibly a heroin overdose related death. Also present at the scene was R.B. who was identified as B.F.'s boyfriend.

2. Investigators with the Southlake Police Department met with R.B. who provided a written statement detailing information that led up to B.F.'s death. R.B. stated that on November 30, 2017 at approximately 8:00 p.m. he and B.F. obtained $40 worth of heroin from a dealer known to him as "Tight" who was later identified by investigators as Michael Dasean ROBINSON. R.B. detailed that he had been introduced to "Tight" by two coworkers. R.B. stated that he and B.F. then drove home (XXX Vermillion Court) and both used the heroin. R.B. stated that he and B.F. fell asleep and he woke up the next morning to find her unresponsive. R.B. attempted to perform life saving measures on B.F. that were unsuccessful and he called 911. B.F. was pronounced deceased at the residence by personnel with Southlake EMS.

3. After B.F.'s death, R.B. through his attorney Bob Gill, cooperated with the Southlake Police Department by providing additional information regarding ROBINSON, the source of supply for the heroin. R.B. provided a cellular phone contact number of XXX-XXX-6112 for ROBINSON and stated that his co-workers had arranged for him to purchase heroin from ROBINSON on one other occasion prior to the evening of the November 30, 2017 transaction. On July 22, 2018, R.B. committed suicide using a firearm.

4. In November 2018, investigators assigned to the DEA Dallas Field Division learned of the aforementioned information and began an investigation into the death of B.F. and the drug trafficking activities of ROBINSON. Investigators were provided with an Iphone cellular phone with an associated number of XXX-XXX-9170 that had been used by R.B. prior to his death.

Investigators were informed by R.B.'s mother that he also had used a telephone number of XXX-XXX-0797 after he stopped using the aforementioned Iphone. Investigators also received the case file regarding B.F.'s death from the Southlake Police Department, which included the related autopsy report. Investigators noted that the autopsy report listed B.F's cause of death as sudden death with history of recent heroin use and the manner of death was listed as an accident.

5. On November 5, 2018, TFO Greg Jones acting in an undercover capacity contacted ROBINSON by text message at telephone number XXX-XXX-6112 in an attempt to purchase heroin and cocaine from ROBINSON. TFO Jones sent "say…can you do 140 b and 60 g…" ROBINSON responded "Yeah," "Come on," and "Who is this." TFO Jones replied "Sorry my new #...J..Can we do.2 or 2.30?" ROBINSON responded "Ok hit me up." A short time later TFO Jones began text messaging with ROBINSON again. TFO Jones wrote "Just now getting out of work…" ROBINSON replied "XXXX Marshall Street." Based on the above text messages TFO Jones requested to purchase $140 worth of heroin and $60 worth of cocaine from ROBINSON ("say…can you do 140 b and 60 g…"). ROBINSON agreed to supply the heroin and cocaine and inquired who TFO Jones was, likely because he did not recognize the number ("Yeah," "Come on," and "Who is this."). TFO Jones attempted to make ROBINSON believe that he was a current customer of his that had gotten a new telephone number to cover the fact that ROBINSON did not recognize his telephone number and to arrange for the transaction to occur around 2:00 p.m. or 2:30 p.m. ("Sorry my new #...J..Can we do.2 or 2.30?"). ROBINSON agreed to do the transaction and informed TFO Jones to contact him back when he was ready ("Ok hit me up.").

A short time later TFO Jones informed ROBINSON that he was just getting out of work ("Just now getting out of work...") and ROBINSON directed him to go to the residence located at XXXX Marshall Street to obtain the heroin and cocaine ("4721 Marshall Street.").

6. Fort Worth PD Narcotics Officers J. Richey #4133 and G. Miller #3670 working together in an undercover capacity were assigned to travel to the residence located at XXXX Marshall Street in Forest Hill, Texas to conduct the heroin and cocaine purchase that TFO Jones was coordinating with ROBINSON. At approximately 3:58 p.m., TFO Jones wrote "Bout to pull up." ROBINSON replied "What's your order." TFO Jones responded "140b 60g" and "Here." ROBINSON wrote "Coming now." TFO Jones informed ROBINSON that he was about to arrive at the residence located at XXXX Marshall Street ("Bout to pull up.") ROBINSON asked TFO Jones to confirm what type of drug and the amount he was requesting to purchase ("What's your order.") TFO Jones advised ROBINSON that he wanted $140 worth of heroin and $60 worth of cocaine and also informed ROBINSON that he had arrived at the residence ("140b 60g" and "Here.").

7. At the same time TFO Jones was sending text messages with ROBINSON as detailed above, Officers Richey and Miller pulled up to the residence and parked out front at the curb. A black male later identified as Marcus Antwon MCLENDON then exited the aforementioned residence and approached the vehicle Officers Richey and Miller were in. Officer Richey then held $200 US Currency out of the driver's side door window as MCLENDON approached. MCLENDON then took the $200 US Currency and handed Officer Richey two clear plastic baggies, one of which contained a black tar like substance and the other contained a white powdery substance. MCLENDON went back into the residence and Officers Richey and Miller

departed the residence. The black tar like substance and white powdery substance was submitted to the Fort Worth PD lab for analysis. The lab analysis showed that the black tar like substance with a weight of 1.511 grams was heroin and the white powdery substance with a field of 0.796 grams was cocaine. A later analysis of the phone toll records associated with ROBINSON's phone (817-812-6112) showed a 7 second outgoing call to telephone number XXX-XXX-6170 believed to be used by MCLENDON and saved in ROBINSON's phone as Antwon Lil Bro around the timeframe in which ROBINSON asked TFO Jones to confirm what he wanted. Investigators believe that the telephone call placed by ROBINSON to MCLENDON was so that ROBINSON could tell MCLENDON how much heroin and cocaine to take out to Officers Richey and Miller who were parked outside the residence.

8. On November 8, 2018, TFO Greg Jones acting in an undercover capacity contacted ROBINSON by text message at telephone number XXX-XXX-6112 in an attempt to purchase heroin from ROBINSON. TFO Jones wrote "Say…Can you do 200b …I get off work @ 1:30.." ROBINSON replied "Yeah." TFO Jones asked "Same spot?" ROBINSON replied "4721 Marshall Street." Based on the above text messages TFO Jones requested to purchase $200 worth of heroin from ROBINSON and informed ROBINSON that he would be getting off work at 1:30p.m. ("Say…Can you do 200b …I get off work @ 1:30.."). ROBINSON confirmed that he would sell TFO Jones $200 worth of heroin ("Yeah."). TFO Jones asked ROBINSON if the transaction would be occurring at the same location as the previous transaction ("Same spot?"). ROBINSON confirmed that the transaction would occur at XXXX Marshall Street like before ("XXXX Marshall Street.").

9.  Fort Worth PD Narcotics Officers J. Richey #4133 and J. Lopez #4192 working together in an undercover capacity were assigned to travel to the residence located at XXXX Marshall Street in Forest Hill, Texas to conduct the heroin purchase that TFO Jones was coordinating with ROBINSON as detailed above. At approximately 2:19 p.m., TFO Jones sent "Here" to ROBINSON and ROBINSON responded "On the way." Officers Richey and Lopez pulled up and parked directly across the street from the residence out at the curb as TFO Jones was informing ROBINSON that he was there. Officer Richey and Lopez remained parked across for a short period of time when they observed MCLENDON exit the residence and get into a gray Chevrolet Impala. MCLENDON pulled out of the driveway and rolled down the window of his vehicle as he was directly across from the driver's side of the vehicle that Officers Richey and Lopez were in. MCLENDON said "Are you waiting for Tight?" Officer Richey confirmed that he was. MCLENDON informed Officer Richey that "Tight" would arrive at the residence in approximately ten minutes and requested that Officer Richey pull his vehicle into the driveway. Officers Richey and Lopez then departed the location and waited nearby while TFO Jones was communicating with ROBINSON by text message.

10. At approximately 2:55 p.m., TFO Jones then wrote "gonna run to the store." At approximately 3:07 p.m. ROBINSON wrote "I'm here" and "Wya." TFO Jones responded "Coming back now." Since Officers Richey and Lopez were leaving the location, TFO Jones informed ROBINSON that he was going to run to the store while he was waiting on him to arrive ("gonna run to the store.").

Approximately 12 minutes later, ROBINSON informed TFO Jones that he had arrived at the residence and asked where TFO Jones was at ("I'm here" and "Wya."). TFO Jones informed ROBINSON that he was coming back to the residence located at XXXX Marshall Street ("Coming back now.").

11. At approximately the same time ROBINSON informed TFO Jones that he had arrived at the residence, members of the surveillance team that were still watching the residence located at XXXX Marshall Street observed a red Camaro bearing Texas license plate KKD4041 arrive at the residence. Members of the surveillance team observed ROBINSON exit the vehicle. Officers Richey and Miller then arrived back at the residence and parked across the street. A short time later, the gray Impala returned to the residence being driven by MCLENDON. Officer Richey observed MCLENDON and ROBINSON meeting near the driver's side of the Camaro and both appeared to be looking under the driver's side dash area of the vehicle. Officer Richey rolled down the driver's side window on their vehicle at which time ROBINSON stated "Just a minute." MCLENDON then went into the residence while ROBINSON waited outside. A short time later, MCLENDON exited the residence and proceeded directly toward Officers Richey and Lopez's vehicle. Officer Richey then handed MCLENDON $200 US Currency and MCLENDON handed Officer Richey a small clear plastic baggy containing a black tar like substance. MCLENDON then walked back toward the front yard area of the residence where ROBINSON was waiting and Officers Richey and Lopez departed the residence. The black tar like substance was submitted to the Fort Worth PD lab for analysis. The lab analysis showed that the black tar like substance with a weight of 2.5352 grams was heroin.

12. After Officers Richey and Lopez departed the residence, members of the surveillance team continued to watch the location. Approximately five minutes after Officers Richey and Lopez departed the location, ROBINSON got into the aforementioned Camaro and departed the residence as well. Members of the surveillance team conducted surveillance of ROBINSON. During the mobile surveillance, TFO Clay Collins observed the vehicle being driven by ROBINSON fail to signal a left hand (eastbound) turn from Marshall Street onto Alandale Drive. Investigators then began to attempt to get a marked patrol unit to conduct a traffic stop on the vehicle based on the observed traffic violation. During the mobile surveillance of ROBINSON, your affiant placed several telephone calls to telephone number XXX-XXX-6112 and members of the surveillance team observed ROBINSON answer the phone each time.

13. Officer R. Dowdy #4044 who was in uniform and a Fort Worth PD marked unit was able to conduct a traffic stop on the vehicle being driven and solely occupied by ROBINSON in the XXX block of Canton Drive in Fort Worth, Texas. Upon approaching the vehicle, Officer Dowdy smelled the fresh odor or marijuana coming from the vehicle. Officer Dowdy had ROBINSON step out of the vehicle so that it could be searched. During a search of the vehicle, Officer Dowdy and assist-officers located a white powdery substance with a field weight 7.4 grams, two clear plastic baggies each containing off white rock like substances with a combined field weight of 5.8 grams, a clear plastic baggy containing a green leafy substance with a field weight of .055 ounces, a baggy containing a black tar like residue, $1819.00 in US Currency and two cellular phones. The above items were submitted to the Fort Worth PD Crime Lab for analysis.

The lab analysis showed that the white powdery substance was 6.2540 grams of cocaine and that the baggy also contained heroin residue, the off-white rock like substance was 4.5950 grams of cocaine, the green leafy substance was 0.5636 grams of marijuana and black tar like substance contained in the plastic baggy was 0.4717 grams of heroin.

14. ROBINSON was placed under arrest for Manufacture/Delivery of a Controlled Substance Penalty Group 1 4-200 grams (Possession with Intent to Distribute a Controlled Substance) and Possession of Marijuana less than 2 ounces. Your affiant then met with ROBINSON to collect information for the state jail booking process. ROBINSON provided a cellular phone contact number of XXX-XXX-6112 and stated that this number was associated with the iPhone that was located in the vehicle that belonged to him. ROBINSON was transported to the Fort Worth PD jail and booked in on the related charges.

15. On November 9, 2018, investigators received the forensic analysis back from the Fort Worth PD Digital Forensics Unit for the Iphone with an associated number of XXX-XXX-9170, which had belonged to R.B. Investigators noted that there were numerous text messages saved in R.B.'s phone that had been sent to ROBINSON and received from ROBINSON who was using cellular phone number XXX-XXX-6112. Investigators located an outgoing text message from R.B. to ROBINSON dated March 31, 2018. R.B. wrote "140 boy 60 girl." ROBINSON responded "Want be ready till 9 read." R.B. replied "Be there at 8:30." Based on these text messages, investigators believe that R.B. was requesting to purchase $140 worth of heroin ("boy") and $60 worth of cocaine ("girl") from ROBINSON. ROBINSON informed R.B. that the heroin and cocaine would not be available until 9:00 a.m. and R.B. informed ROBINSON that he would arrive around 8:30 a.m.

Criminal Complaint – Page 9

Investigators believe based on the messages that ROBINSON sold R.B. $140 worth of heroin and $60 worth of cocaine on this particular date. Your affiant reviewed all the other text messages saved in R.B.'s phone that were exchanged with ROBINSON. Your affiant noted that none of the text messages contained content that was personal in nature, and all the messages were in regards to R.B. obtaining heroin and cocaine from ROBINSON.

16. On November 12, 2018, TFO Travis Verrett presented Tarrant County District Court Judge Christopher Wolfe with a search warrant to conduct a forensic analysis of the iPhone with an associated number of XXX-XXX-6112 that had been seized from ROBINSON on November 8, 2018 as detailed above. Judge Wolfe reviewed the search warrant and signed it on this same date. On November 13, 2018, your affiant took the aforementioned phone to the Fort Worth PD Digital Forensics Unit for analysis. Your affiant received the analysis of this phone back on the same date.

17. Upon reviewing the forensic analysis of the phone your affiant noted the following things as detailed below. Your affiant, in reviewing the phone contact section observed that there were multiple names saved with notations after the names such as black, white, hard and cream. Your affiant knows based on training and experience that black is a common street term for heroin, white is a common street term for powder cocaine, hard is a common street term for crack cocaine and cream is a common street term for methamphetamine. Your affiant believes that these individuals are heroin, cocaine, crack cocaine and methamphetamine customers of ROBINSON, and that he had the names saved in this fashion so that when each customer requested a quantity of drugs that ROBINSON would know what kind of drug they were asking for due to his large customer base.

Your affiant knows based on training and experience that it is common for customers to send an amount of drugs they wish to purchase, but not necessarily always send a drug type if they commonly purchase the same drug from the dealer. A review of the text messages sent to individuals with each of these notations confirmed that the notation by the names were consistent with the type of drugs they were asking for in the text messages. Your affiant noted that based on these notations by the names there were approximately 100 heroin customers, 80 cocaine customers, 25 crack cocaine customers and 25 methamphetamine customers contained in ROBINSON's phone.

18. Your affiant also noted that R.B.'s cellular phone number of XXX-XXX-9170 was saved in ROBINSON's phone under the name Read Black and R.B.'s cellular phone number of XXX-XXX-0797 was saved as Reed Black. Your affiant then began to review the text messages exchanged between telephone number XXX-XXX-6170 believed to be used by MCLENDON and ROBINSON. Based on the text messages it appeared that MCLENDON began working for ROBINSON in the distribution of drugs, which included from the residence located at XXXX Marshall Street in the month of October 2018. The content of the text messages between MCLENDON, ROBINSON and customers revealed that ROBINSON would be contacted by the customers directly and would at times distribute the drugs to them personally, and also at times would direct them to the residence located at XXXX Marshall Street or other locations to obtain the drugs from MCLENDON. ROBINSON would inform MCLENDON of the types and amounts of drugs each customer he sent to the address would be picking up as well as the customers' vehicle descriptions so MCLENDON could associate a vehicle with the particular order.

Your affiant noted that all the aforementioned text messages sent and received by TFO Jones related to the November 5th and November 8th, 2018 transactions were also contained in ROBINSON's phone.

19. Upon reviewing the toll analysis associated with R.B.'s cellular phone with an associated number of XXX-XXX-9170 and ROBINSON's cellular phone with an associated number of XXX-XXX-6112 your affiant noted the following things as detailed below. The subscriber records showed that the phone number XXX-XXX-6112 being used by ROBINSON had been activated on October 7, 2017 and was currently active. Your affiant noted that between November 30, 2017 and April 11, 2018, R.B. and ROBINSON exchanged 604 calls and text messages during this period of time.

20. Your affiant in reviewing the phone tolls from November 30, 2017 noted that 14 phone calls and 11 text messages were exchanged between R.B. and ROBINSON. Your affiant noted that 6 of these phone calls and 9 of these text messages occurred between 7:09 p.m. and 8:02 p.m., which your affiant believes further supports R.B.'s written statement taken by Southlake PD on December 1, 2017 detailing that he and B.F. obtained heroin from ROBINSON on November 30, 2017. Upon reviewing the toll analysis associated with R.B.'s cellular phone with an associated number of XXX-XXX-0797 and ROBINSON's cellular phone with an associated number of XXX-XXX-6112 your affiant noted the following things as detailed below. Your affiant noted that between April 30, 2018 and July 17, 2018, R.B. and ROBINSON exchanged 114 calls and text messages during this period of time.

21. On November 14th and November 15th, 2018, your affiant spoke with Deputy Medical Examiner Dr. Susan Roe and Chief Toxicologist Dr. Robert Johnson who both work at the Tarrant County Medical Examiner's Office and both were involved in the Autopsy of B.F. Dr. Roe stated that when heroin is used it is metabolized in the body into 6-monoacetylmorphine commonly referred to as 6 MAM and then into morphine. Dr. Roe stated that during an autopsy if drug use is suspected the deceased individual's urine is checked for the presence of 6 MAM, which for autopsy purposes assists in determining that heroin was used as opposed to morphine since ultimately heroin metabolizes into morphine in the body. Dr. Roe stated that B.F. had no urine in her body at the time of the autopsy so that she was unable to check for the presence of 6 MAM. In focusing only on the autopsy, Dr. Roe stated that if not for the use of heroin or morphine B.F. would not have died as she was otherwise a healthy young individual. Dr. Roe stated that based on the totality of the circumstances and taking into account the presence of heroin use at the scene that B.F. likely used heroin, which caused her death as opposed to actual morphine which is reflected in the cause of death on the autopsy report.

22. Dr. Johnson stated that the toxicology showed that there were no other illegal substances in B.F.'s body. Dr. Johnson stated that due to the lack of the presence of 6 MAM, the use of morphine could not be ruled out from just a toxicology screen. Dr. Johnson stated that the amount of morphine located in B.F.'s body if actual morphine was used would not have caused B.F. to die. Dr. Johnson stated that heroin which metabolizes into morphine in the body would have the ability to cause death as in this circumstance.

23. On November 15, 2018, TFO James Fields met with investigators assigned to Southlake Police Department. TFO Fields collected two syringes, a spoon containing residue and two pieces of plastic, one of which contained a brown tar like residue that was originally collected on December 1, 2017 from the crime scene involving B.F. These items were submitted by TFO Fields and TFO Smith to the DEA South Central Lab for analysis.

24. On November 30, 2018 your affiant, TFO Jim Fields and TFO Greg Jones conducted independent interviews with two Sources of Information (herein after referred to as SOI 1 and SOI 2). SOI 1 and SOI 2 identified ROBINSON who they knew as "Tight" as a source of supply for cocaine and heroin among other things. SOI 1 and SOI 2 stated that most recently ROBINSON had been driving a red Chevrolet Camaro. SOI 1 and SOI 2 stated that they had been purchasing user amounts of cocaine and heroin from ROBINSON on a daily basis for approximately 3 years. SOI 1 and SOI 2 stated that around November 2017 they met R.B. who at that time was looking for a source of supply for heroin as he did not have one. SOI 1 and SOI 2 stated that they were each individually approached by R.B. inquiring if they would connect him with their heroin source of supply. SOI 2 stated that in the afternoon hours on November 30, 2017, he/she along with another individual introduced R.B. to ROBINSON for the purpose of obtaining cocaine and heroin on that date.

25. SOI 2 stated that approximately one month later he/she met with R.B. SOI 2 stated that it was at this time that R.B. told him/her that B.F had died after using heroin. SOI 2 stated that R.B. told him/her that in the evening on November 30, 2017 he and B.F. went and obtained heroin from ROBINSON and then used the heroin.

SOI 2 stated that R.B. told him/her that the next morning he woke up and B.F. was dead. SOI 2 stated that he/she later learned that R.B. had killed himself.

26. On November 28 and December 6, 2018, your affiant received the lab results of the evidence items from the B.F. crime scene that were submitted to the DEA Lab for analysis. No controlled substances were located in one of the syringes and cocaine residue was located in the other syringe. Cocaine and heroin residue was located in both the plastic baggy and the spoon recovered at the location. Your affiant believes that these lab analysis further supports the use of heroin by R.B and B.F. on November 30, 2017.

27. On November 29, 2018, TFO James Fields received an email from attorney Bob Gill who had been retained by R.B. after B.F.'s death had occurred. Attorney Gill provided investigators with an email containing his notes from his meeting with R.B. regarding the heroin overdose investigation. The notes provided by Attorney Gill matched the information contained in the written statement taken from R.B. on December 1, 2017 as detailed above in paragraphs 2 and 3.

28. On December 3, 2018, your affiant and TFO William Snow conducted an interview with a Source of Information (herein after referred to as SOI 3). SOI 3 stated that on February 1, 2018 he/she drove R.B. into Fort Worth, Texas so that R.B. could purchase drugs. SOI 3 stated that they traveled to an apartment complex in east Fort Worth where they waited at the location for approximately 45 minutes to an hour for the source to arrive. SOI 3 stated that while waiting in the vehicle R.B. was communicating with the source by phone and text message. SOI 3 stated that R.B. was notified by phone that the source had arrived and he got out of the vehicle and walked into the complex to meet the source to obtain the drugs. SOI 3 stated that a short time later R.B. returned.

29. SOI 3 stated that they drove to a nearby neighborhood close to the apartment where R.B. had met the source. SOI 3 stated that while parked in the neighborhood R.B. began to prepare the heroin for use which had been obtained from the source. SOI 3 stated that R.B. was also in possession of cocaine that had been obtained from the source. SOI 3 stated that Fort Worth PD officers responding to a suspicious vehicle call then approached their vehicle and arrested R.B. after he was found in possession of heroin and cocaine as detailed in Fort Worth PD report number 18-10048. SOI 3 provided a cellular phone number of XXX-XXX-9170 for R.B.

30. Your affiant in reviewing the phone tolls from February 1, 2018 noted that 4 phone calls and 22 text messages were exchanged between R.B. and ROBINSON on this date which occurred between 7:10 p.m. and 8:11 p.m. Your affiant further noted that at 8:42 p.m. Fort Worth PD patrol officers made contact with SOI 3 and R.B. on the suspicious person call as detailed above. Your affiant believes that the cocaine and heroin seized on this date was supplied by ROBINSON based on the short window of time in which R.B. last communicated with ROBINSON by phone and when Fort Worth PD officers contacted and arrested R.B. Your affiant additionally believes that the February 1, 2018 seizure of heroin and cocaine combined with the associated toll records further supports that ROBINSON supplied the heroin to R.B. on November 30, 2017, which resulted in the death of B.F.

31. Although I have not listed all the facts regarding the offenses of **Michael Dasean ROBINSON**, I believe that the facts stated here establish probable cause that **Michael Dasean ROBINSON** has committed a violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)),

Conspiracy to Possess a Controlled Substance with Intent to Distribute and 21 U.S.C. § 841 (a)(1) and (b)(1)(C) and 18 U.S.C. § 2, Distribution of a Scheduled I Controlled Substance and Aiding and Abetting.

_____
Steven Smith
Task Force Officer
Drug Enforcement Administration

SWORN AND SUBSCRIBED before me, at 3:15 pm, this 7th day of January, 2019, in Fort Worth, Texas.

_____
JEFFREY L. CURETON
United States Magistrate Judge